# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GAMAL HILTON, # 345944,

        Petitioner,

v.                                  Case No. 07-cv-14415
                                  Honorable Lawrence P. Zatkoff

THOMAS K. BELL,

        Respondent,

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT
## OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF
## APPEALABILITY AND DENYING "MOTION IN OBJECTION" AS MOOT

### I. INTRODUCTION

This is a habeas case filed under 28 U.S.C. § 2254. Petitioner Gamal Hilton is a state prisoner currently confined at the St. Louis Correctional Facility in St. Louis, Michigan.[1] In his *pro se* pleadings, Petitioner challenges his 2002 convictions for (1) seven counts of first-degree criminal sexual conduct (CSC), MICH. COMP. LAWS § 750.520b, (2) three counts of armed robbery, MICH. COMP. LAWS § 750.529, (3) three counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, (4) three counts of felony firearm, MICH. COMP. LAWS § 750.227b(a), and (5) one count of receiving or concealing stolen property less than $200, MICH. COMP. LAWS § 750.535(5),

_____

[1]Petitioner was incarcerated at the Carson City Correctional Facility when he originally filed his habeas petition; however, he has since been transferred to the St. Louis Correctional Facility. The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a) of the Rule Governing § 2254 Cases; *see also Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption. However, because the Court is denying the petition in this case, it finds no reason to do so.

which were imposed by a Wayne County Circuit Court jury.  He was sentenced to concurrent prison terms of twenty-three to forty years each for the CSC, armed-robbery, and assault convictions, and to time served (ninety-three days) for the stolen-property conviction, to be served consecutive to three concurrent prison terms of two years each for the felony-firearm convictions.  For the reasons set forth below, the Court will deny the petition.  The Court also will decline to issue Petitioner a certificate of appealability.  As a result of the Court denying Petitioner's habeas petition, his "Motion in Objection" will be denied as moot.

## II.  BACKGROUND FACTS

Petitioner's troubles in this case arise from three separate incidents that occurred in June 2003.  Trial began on December 1, 2003, and concluded on December 15, 2003.  The prosecution presented fifteen witnesses and numerous exhibits.  Petitioner testified.  The Court finds the following testimony pertinent.

The first incident involved TT[2] and her boyfriend BJ.  TT was first to testify.  She said she was in Eliza Howell Park in the early morning hours of June 28, 2003, with BJ.  A man she described as dark, tall, and slim, and wearing a mask came up to the driver's side of the car and told BJ to get out.  He pointed a gun at him and said he would kill him.  The man then ordered TT out of the car.  He told them both to lie on the ground.  The man took BJ's cell phone, earrings, and wallet. He forced TT to perform oral sex on him.  He also had intercourse with her.  He had the gun in his hand throughout the acts.

BJ testified next.  He identified his wallet, in court, as the wallet the man took from him at

---

[2]The Court will use initials for the names of the victims in order to protect their identities.

2

gunpoint.  He also identified the picture piece that went into the wallet and said it contained his driver's license.  BJ said the gun the man held was a nine-millimeter pistol.

The second incident involved SK and MM.  SK said she was with MM in Eliza Howell Park in the early morning hours of June 29, 2003, when a man came up to the car.  The man had a gun and told them to get out.  SK said the man was tall, thin, and had a medium-brown or dark complexion.  He was wearing a mask.  He told SK and MM to lie on the ground and asked MM for his wallet.  The man then told them he was going to take SK and that he would shoot MM if he moved.  He ordered MM into the trunk of the car.

With MM in the trunk, the man forced SK to perform oral sex on him and also had intercourse with her.  He held the gun during the acts.  The man told SK he was from the "streets." He then told her how to open the trunk to release MM.  MM also testified.  He gave the same description of the man.  He said the man was not wearing gloves.

The third incident involved SD and AA.  SD testified that she was in Howell Park in the early morning hours of June 29, 2003, with her friend, AA.  When AA got out of the car at one point, a man appeared with a gun.  He told AA to give him money and, when AA said he did not have any, he ordered him into the trunk.  She described the man as being 5'10" or 5'11", dark-skinned, and slim.  She said he was wearing a mask. The man ordered SD out of the car and had her follow him toward the woods.  He forced her to perform oral sex on him and then had intercourse with her.  AA described how the man forced him into the car trunk.  He also described the man as a black male, 5'10", about 165 pounds, with dark clothing and panty hose over his face.  He said he was armed with a nine-millimeter gun.

Agent Paul Sorce, a Federal-Bureau Investigator, was on surveillance in Howell Park on July

3

5, 2003, when he saw Petitioner, dressed in dark clothing.  The surveillance crew was given a description of a black male, tall, with dark clothing and a ski mask, as the suspect in sexual assaults in the park.  With his night-vision goggles, Agent Sorce followed Petitioner.  Petitioner crouched under a tree, then crawled toward an unmarked police vehicle.  He ran off into the woods when the police began turning on their flashlights.  Petitioner was then apprehended.

Officer Everett Monroe, a Detroit Police Officer, also using night-vision goggles, saw a man walking on the east edge of Elijah Howell Park on July 5, 2003.  His testimony was similar to Agent Sorce's.  When Petitioner was apprehended, his clothing was wet and covered with dirt and clay.  He was wearing black jeans, a jacket, and a grayish shirt.

Detroit Police Officer Gary Hund testified next.  He said he saw Petitioner on the sidewalk near his scout car parked on Bramell Street after 2 a.m. on July 5.  Petitioner's clothing was wet and the back of his pants was covered with mud.  Officer Hund told the other officers on surveillance.  Petitioner was stopped.  According to Officer Hund, Petitioner told him that he had gotten into a water-balloon fight with a buddy.

Detroit Sergeant Willie Coleman also was on surveillance on July 5 in Howell Park.  He saw a person go into the treeline in the park.  He was later called to Bramell Street and saw Petitioner, soaking wet and covered with mud.  After Sergeant Coleman discovered where Petitioner lived, he went to the house and spoke with his wife.  She signed a consent to search form.

In his search, Sergeant Coleman found two black wallets, one with a registration to a 1993 Olds.  The registration had the name RJ on it, and the identification in the other wallet was that of BJ.  The 93 Olds was registered to BJ.  Sergeant Coleman also found a live nine- millimeter round in the room.  He seized a note pad with rap lyrics and two "do rags" from a car outside.  The note

4

pad with the rap lyrics was admitted into evidence, over defense counsel's objections.

Detroit Sergeant Nicholas Giaquinto, also on surveillance on July 5 at Howell Park with the other officers, testified that he participated in the discovery of the two wallets, one for BJ and one for RJ, a nine-millimeter round, a note pad with rap lyrics, and two "do rags." Detroit Police Officer Mary Gross examined the box taken from MM's car and found a usable print on it. The print belonged to Petitioner. Marcia McCleary, employed by the Detroit Police Department Latent Print unit, also testified that the fingerprints found on the box belonged to Petitioner.

Detroit Police Officer Nicole LaRosa testified that when Petitioner was under arrest at the 8th Precinct on July 5, he smelled like sewer water. She said his clothing was wet. He told her he got wet from a water-balloon fight. After the prosecution rested, Petitioner motioned the trial court for a directed verdict, on the basis of improper identification. The trial court denied the motion.

Officer Carla Williams testified for the defense. She said the cardboard box from which Petitioner's print was found was taken from MM's car. Riccara Scofield, Petitioner's wife, testified that she consented to a search of their house on July 5. She said when Petitioner left the house sometime after midnight on July 4, he told her he was going to buy marijuana.

Petitioner testified. He said he left the house after midnight on July 4. He said it was raining. He bought some marijuana and then got into a fight with several men. They had him on the ground and his right hand was injured. He did not know how BJ's wallet got into his house or how his fingerprint got on the box taken from MM's car. He admitted not telling the police about being in a fight.

While Petitioner was testifying, defense counsel noted that the complainants were seated in the courtroom. With the jury excused, she argued that she had previously waived the sequestration

5

order because she believed the complaining witnesses would not be called in rebuttal. However, she admitted that the prosecutor had stated that he might call them if Petitioner took the stand. The prosecutor responded that a victim has a right to be in the courtroom after testifying. The problem the complainants faced was the issue of voice identification. The prosecutor stated that the victims told him they recognized Petitioner's voice, having heard him testify. He wanted them called in rebuttal.

Defense counsel argued that the police should have held a voice-identification procedure before trial. She said she did not know there would be a voice-identification issue, and that if she had known the victims were going to testify again, she would not have waived the sequestration order. After considering the arguments, and reviewing relevant case law, the trial court said that the complainants would be allowed to testify in rebuttal. The prosecutor then continued to question Petitioner. Petitioner said he had no idea how a nine-millimeter bullet got into his house. He denied that his fingerprint was on the cardboard box. The defense rested. SK and TT testified in rebuttal. They said they recognized Petitioner's voice as that of the man who sexually assaulted them. The jury convicted Petitioner as stated.

At sentencing on January 7, 2004, defense counsel attempted to argue for a new trial on the basis of jury misconduct. Counsel had no affidavit and wanted an adjournment. The trial court dismissed the motion as untimely. Following his sentencing, Petitioner filed a claim of appeal with the Michigan Court of Appeals, raising the following three claims: (1) the trial court erred in denying his motion for directed verdict, because there was insufficient evidence that he committed the multiple acts of criminal sexual conduct, (2) the trial court erred in admitting the rap lyrics, and (3) his attorney was ineffective by waiving the sequestration order. He subsequently filed a

6

supplemental brief, alleging the following five claims: (1) his Fourth Amendment rights were violated, (2) the prosecutor committed misconduct, (3) his trial counsel was ineffective for failing to call alibi witnesses, (4) the trial court erred in admitting hearsay testimony of an alleged expert, and (5) the trial court erred in denying his *Batson*[3] claim.

On June 23, 2005, the Court of Appeals affirmed Petitioner's convictions. *People v. Hilton*, No. 254002, 2005 WL 1489494 (Mich. Ct. App. June 23, 2005). He then filed an application for leave to appeal the Court of Appeals's decision with the Michigan Supreme Court, raising the same claims. On October 31, 2005, the Supreme Court denied the application. *People v. Hilton*, 474 Mich. 910, 705 N.W.2d 122 (2005).

On July 5, 2006, Petitioner filed a motion for relief from judgment with the trial court, which was denied. *People v. Hilton*, No. 03-8451-01 (Wayne County Circuit Court, July 5, 2006). On September 6, 2006, he filed a successive post-conviction motion, which was denied as such. *People v. Hilton*, No. 03-8451-01 (Wayne County Circuit Court, Sept. 6, 2006).

Petitioner then filed an application for leave to appeal that decision with the Court of Appeals, alleging the following: (1) the trial court erred in converting his motion for a *Ginther*[4] hearing into a motion for relief from judgment, (2) the trial court erred in ruling that the arraignment video was not newly-discovered evidence, (3) his appellate counsel was ineffective, and (4) he is actually innocent of the crimes. The Court of Appeals denied his application on June 18, 2007, for failure "to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v.*

---

[3]*Batson v. Kentucky*, 476 U.S. 79 (1986).

[4]*People v. Ginther*, 390 Mich. 436, 443, 212 N.W.2d 922 (1973).

*Hilton*, No. 275572 (Mich.Ct.App. June 18, 2007).  His motion for reconsideration was denied on July 17, 2007.

Petitioner subsequently filed an application for leave to appeal the Court of Appeals's decision with the Supreme Court, which was denied on September 24, 2007, "because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Hilton*, 480 Mich. 894, 738 N.W.2d 723 (2007).

On October 17, 2007, Petitioner filed the pending habeas petition, raising the following claims: (1) insufficient evidence, (2) improper admission of the rap-lyric book, (3) ineffective assistance of counsel where counsel waived the sequestration order, (4) juror misconduct, (5) prosecutorial misconduct, (6) improper admission of testimony regarding muddy clothes, (7) ineffective assistance of counsel for failing to call an alibi witness, (8) improper admission of expert testimony, (9) a *Batson* violation, (10) a *Brady*[5] violation, and (11) ineffective assistance of appellate counsel regarding jury misconduct.

### III.  STANDARD OF REVIEW

28 USC § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[5]*Brady v. Maryland*, 373 U.S. 83 (1963).

8

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Federal courts are therefore bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). This Court must presume the correctness of a state court's factual determinations. 28 U.S.C. § 2254(e)(1).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Williams*, 529 U.S. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.
>
> [A]n unreasonable application of federal law is different from an incorrect application of federal law . . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court

9

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11.

Recently, in *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 786 (2011), the United States

Supreme Court held:

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, [] (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. ----, ----, 129 S.Ct. 1411, 1413-14, [] (2009) (internal quotation marks omitted).

With those standards in mind, the Court proceeds to address Petitioner's claims.

## IV.  DISCUSSION

### A.  Claim I–Insufficient Evidence

In his first habeas claim, Petitioner alleges that there was insufficient evidence to convict him because the alleged victims could not properly identify him. In all three incidents, the perpetrator was wearing a mask when the assaults, rapes, and robberies were committed.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the

10

habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Matthews*, 319 F.3d at 788-89 (citation omitted). In determining the sufficiency of the evidence, the Court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993) (citations omitted).

Petitioner raised this claim on direct appeal but the Michigan Court of Appeals rejected it, stating:

> In this case, all six victims testified that the perpetrator was a tall, thin, masked man of medium to dark complexion. In each case, the perpetrator wore dark clothes, approached the victims' cars late at night, pointed a gun, identified as a nine millimeter, at them, and demanded their money. Each female victim was forced to kneel and perform fellatio on the perpetrator, while he held their heads, and then each was forced to bend over, and the perpetrator sexually assaulted them from behind. Approximately a week after the assaults, the police spotted a man fitting the assailant's description enter the park late at night. The suspect crouched under a tree, then crawled toward an unmarked police vehicle. When the officer got out of the vehicle and walked around to the passenger side, the suspect returned to his original crouched position. He ran off into the woods when the police began turning on their flashlights and moving in his direction.
>
> Defendant was arrested at approximately 2:00 a.m. that night while walking down Bramell Street near the park. Defendant was wet from the neck down, smelled like sewer water, and was muddy and dirty. He fit the description of the sexual assault assailant and was dressed in black clothes. Defendant lived in a townhouse abutting the park. A wallet and picture insert belonging to one of the robbery victims, BJ, was discovered in defendant's bedroom; it contained BJ's driver's license, and two registrations and proofs of insurance in BJ's father's name. A

11

nine-millimeter bullet was also found in defendant's bedroom. Defendant's fingerprints were also found on a box that the perpetrator took out of victim MM's car. Defendant had no explanation for any of the physical evidence. Two of the victims, TT and SK, identified defendant's voice at trial as the same voice as the person who assaulted them.

Viewed in a light most favorable to the prosecution, the evidence and reasonable inferences arising therefore was sufficient to enable the jury to find beyond a reasonable doubt that the same person committed each of the charged crimes and that defendant was that person.

*Hilton*, 2005 WL 1489494, at *1-2.

The evidence at trial supports the Court of Appeals's decision. The prosecution presented both direct and circumstantial evidence that Petitioner committed all the crimes for which he was charged. In all three crimes, there was strong evidence of the similarity of method that was used in each. In each assault, in the middle of the night, a man, masked and dressed in black, and armed with a gun, approached a car where a man and woman were seated. He ordered them out, and in two of the cases, had the man climb into the trunk of the car. He then had the females perform oral sex on him and subsequently penetrated them from the rear. He either took money or some other items that belonged to the victims. Two wallets, a wallet and its insert, that were stolen from BJ were found in Petitioner's bedroom. His fingerprints were found on a box inside MM's car. Petitioner could not explain why those items were found in his bedroom or why his fingerprints were on the box.

Petitioner's story morphed as he was questioned by the police. When he was initially arrested, he explained his wet clothes by saying he was in a water-balloon fight. At the police station, he never mentioned the fight. At trial, he testified that he got wet because it was raining and that he was muddy because he was in a fight with some guys. However, during their surveillance, the police witnessed Petitioner in the park; they saw him crouched down in some trees near the river

12

where the assaults had occurred days before.

Viewing all of the evidence in a light most favorable to the prosecution, the Court concludes that the jury was presented with sufficient evidence to find Petitioner guilty beyond a reasonable doubt. Here, the victims' testimony, if believed, established the necessary elements of the offenses charged against Petitioner. It is the function of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).

The Court concludes that the Court of Appeals's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to habeas relief regarding his insufficient-evidence claim.

## B. Claims II and VIII–Improper Admission of Evidence–Rap-Lyric Book and Expert Testimony

In his second habeas claim, Petitioner alleges that he was denied a fair trial because the trial court admitted evidence of a two-year-old-rap-lyric book. In his eighth habeas claim, he alleges that he was denied a fair trial when the trial court allowed the testimony of an expert witness who did not meet the national standards of an expert testifying in such cases.

Violations of state law and procedure that do not infringe on specific federal constitutional protections are not cognizable on federal-habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Most claims involving whether evidence is admissible under state law also are not cognizable on habeas review. *See Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). "A violation of state law is not cognizable in federal habeas corpus unless such error amounts to a

13

fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution." *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008), *cert. denied*, ___ U.S. ___, ___, 129 S.Ct. 1991 (2009) (citations omitted).   For the following reasons, the alleged violations of state law did not result in a fundamental miscarriage of justice or in a violation of the right to due process.

### 1.  Admission of rap-lyrics

First, regarding the admission of the rap-book lyrics, the Court of Appeals found that the testimony was improperly admitted, but nonetheless was harmless error:

> We agree that the rap lyrics were inadmissible as substantive evidence of defendant's state of mind or intent; however, we find the error harmless.
>
> * * *
>
> In this case, the rap lyrics written by defendant bear some similarities to the charged crimes because they describe similar sexual assaults, a mask, black clothes, and efforts to avoid being apprehended.  However, the lyrics are not specific to the victims in this case or the charged crimes and were not purported to be probative of any specific disputed issue in this case, i.e., intent. The prosecutor argued that the lyrics were representative of defendant's "state of mind" and "what he's doing." Absent some other specific basis for admission, which is not apparent, the lyrics were other acts evidence, properly considered under MRE 404(b).  Admission under MRE 404(b) would require that, once a proper purpose was established for admission, the court weigh the probative value of the evidence against the danger of unfair prejudice, MRE 403, and if appropriate, give a cautionary instruction to the jury concerning the limited use of the lyrics.  In this case, however, no such analysis was undertaken, and the court simply admitted the lyrics as substantive evidence.
>
> The prosecutor used the lyrics to cross-examine defendant, reading them aloud, and recited the lyrics again at length in rebuttal argument, attempting to use the lyrics to link defendant to the charged crimes.  The lyrics describe sexual and violent acts in crude terms, and contain much profanity. The lyrics were highly prejudicial.  Any probative value of the lyrics was substantially outweighed by the danger of unfair prejudice.  Therefore, the trial court abused its discretion by admitting the lyrics into evidence.
>
> Nonetheless, error in the admission of bad acts evidence does not require

reversal unless it affirmatively appears that it is more probable than not that the error was outcome determinative. The defendant bears the burden of establishing that, more probably than not, a miscarriage of justice occurred. Id. Defendant offers no argument to support his claim that the error requires reversal of his conviction.

In this case, there was overwhelming evidence of defendant's guilt. This included the circumstances of defendant's arrest, his proximity to the crime scene, and his muddy, wet, and sewage-odor condition, for which defendant provided incredulous explanations, such as that he was wet from a water fight. Defendant fit the description of the sexual assault assailant and was dressed in black clothes. Most importantly, in addition to other evidence, one victim's wallet, drivers license, vehicle registration, and proof of insurance were discovered in defendant's bedroom, and defendant's fingerprints were found on a box that the perpetrator took out of another victim's car. Defendant had no explanation for any of the physical evidence. There is no indication that the jury focused in particular on the rap lyric evidence. Defendant has failed to show that, more probably than not, a miscarriage of justice occurred because of the error.

*Hilton*, 2005 WL 1489494, at *2-3 (citations and footnotes omitted).

This Court agrees with the Court of Appeals's decision, finding that the admission of the rap lyrics may have been somewhat prejudicial but nonetheless harmless. The violation did not have a substantial and injurious effect on the case. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that, on collateral review, a federal-habeas court assesses the prejudicial impact of a state court's constitutional error under the "substantial and injurious effect" standard, not under the more strict "harmless beyond a reasonable doubt" standard, regardless of whether the state court recognized the error and reviewed it under the harmless beyond a reasonable doubt standard) (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

The evidence presented at trial against Petitioner, though mostly circumstantial, was overwhelming, including, among other things: (1) his proximity to the crime scene; (2) his muddy, wet, and sewage-odor condition; (3) his fingerprints on a box in one of the victim's car; and (4) the discovery of one of the victim's wallet, drivers license, vehicle registration, and proof of insurance

15

in his bedroom.  Moreover, Petitioner could not explain away any of the physical evidence.  And,

there is no indication that the jury focused primarily on the rap-lyric evidence.  As the Court of

Appeals stated, "[Petitioner] offers no argument to support his claim that the error requires reversal

of his conviction."  *Hilton*, 2005 WL 1489494, at *3.  *See also Amati v. Crawford*, 371 F.App'x 793,

793 (9th Cir. 2010) ("Amati has not made a substantial showing of the denial of a constitutional

right resulting from admission at trial of his statements made in the form of rap lyrics.") (citations

omitted).

The Court finds that Petitioner has failed to show that the alleged evidentiary error rose to

the level of a federal-constitutional claim warranting relief.  Therefore, the Court concludes that

Petitioner is not entitled to habeas relief on this claim.

### 2.  Admission of expert witness

Regarding his expert-witness claim, the Court of Appeals stated:

> Defendant next argues that the trial court abused its discretion by qualifying
> Marcia McCleary as an expert in latent fingerprint identification. We conclude that
> defense counsel's statement affirmatively expressing that she had no objection to
> McCleary being qualified as an expert waived this issue for purposes of appeal.  An
> "apparent error that has been waived is 'extinguished'" and, therefore, is not
> susceptible to review on appeal.

*Hilton*, 2005 WL 1489494, at *7 (citations omitted).

The Court agrees with the Court of Appeals in that this issue was waived by trial counsel.

Trial counsel affirmatively expressed that she had no objection to McCleary being qualified as an

expert.  Moreover, this claim is non-cognizable because it is a state-law evidentiary issue.  *Estelle*,

502 U.S. at 67-68.  Finally, the Court finds that any alleged error did not result in a miscarriage of

justice or violation of due process.  The fingerprint expert's testimony was properly admitted under

Michigan law to demonstrate that Petitioner had been present in a car belonging to one of his

16

victims.  Petitioner is not entitled to habeas relief regarding this claim.

### C.  Claims III and VII–Ineffective Assistance of Counsel

In his third habeas claim, Petitioner alleges that his trial counsel was ineffective for failing to object to the presence of the complainants in the courtroom while he was testifying because they could hear and identify his voice.  In his seventh habeas claim, he alleges that trial counsel was ineffective for failing to investigate another suspect who matched his description, for failing to obtain a videotape of his bond hearing to show that his clothing was not muddy at the time of his arrest, and for failing to call alibi witnesses.

To establish that he received ineffective assistance of counsel, a petitioner must show: (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance."  *Id.* at 689.  This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.* at 687.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694. "[T]he focus should be on whether the result of the trial was 'fundamentally unfair or unreliable.'"  *Tinsley v. Million*, 399 F.3d 796, 802 (6th Cir. 2005) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).  Moreover, in *Harrington*, the United States Supreme Court stated, "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington*, ___ U.S. at

17

___, 131 S.Ct. at 788 (internal and end citations omitted).

### 1.  Voice-identification testimony

The Court of Appeals, the last state court to issue a reasoned decision regarding Petitioner's voice-identification-testimony claim, held, in relevant part:

> It is undisputed that defense counsel consented to the victims remaining in the courtroom after their testimony.  But, at the time, counsel may have consented for strategic reasons, i.e., so as not to antagonize the jury, and defendant has not overcome the presumption that counsel's conduct might be considered sound trial strategy.
>
> In any event, counsel objected to the voice identification testimony before the witnesses were called to the stand, and moved for a mistrial, which the court denied. However, the court stated that it would allow the defense wide latitude in its cross-examination of the rebuttal witnesses.  Further, the defense called two male victims in sur rebuttal, both of whom failed to identify defendant by his voice.  As noted previously, although the evidence against defendant was circumstantial, it was very strong.  In particular, there was no explanation for the presence of BJ's personal belongings in defendant's bedroom, or defendant's fingerprints on a box in MM's car.  Defendant has not
> demonstrated that, but for counsel's alleged error, there is a reasonable probability that the outcome of the trial might have been different.

*Hilton*, 2005 WL 1489494, at *3 (citations omitted).

First, to the extent that Petitioner claims the state courts improperly failed to conduct an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973), this claim is not cognizable on habeas review.  *Ginther* does not confer an absolute right to an evidentiary hearing in all cases where a defendant alleges ineffective assistance of counsel, and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  Therefore, this portion of Petitioner's claim is not cognizable on habeas-corpus review.

Second, trial counsel did object to the voice-identification testimony before the witnesses were called to the stand, and moved for a mistrial.  The trial court denied the motion but said that

18

defense counsel would be given wide latitude in its cross-examination of the witnesses. Furthermore, defense counsel called two of the male victims to testify in sur-rebuttal, both of whom failed to identify Petitioner by his voice.

Accordingly, the Court finds that Petitioner cannot demonstrate that counsel was deficient or that he was prejudiced by any alleged errors by defense counsel; Petitioner fails to establish that there is a reasonable probability that the outcome of the trial would have been different. He is not entitled to habeas relief regarding this issue.

### 2. Remaining ineffective-assistance-of-counsel claims

In rejecting Petitioner's remaining ineffective-assistance-of-counsel claims, for failing to obtain a videotape of defendant's bond hearing, for failing to investigate the arrest of another masked person, and for failing to locate and call an alibi witness, the Court of Appeals stated:

> First, it is not apparent that a videotape of defendant's bond hearing would have disclosed the condition of his clothing. Furthermore, as previously discussed, this was not a critical issue at trial and the absence of evidence on this point did not deprive defendant of a substantial defense. We therefore reject defendant's claim that counsel was ineffective for failing to obtain a videotape of defendant's bond hearing for the purpose of enabling the jury to possibly see whether defendant's clothes were muddy.

> There is no record evidence concerning the arrest of a different masked person, or whether this person may have fit the physical description of the perpetrator of the charged crimes in this case. Nor does the record indicate to what extent, if any, counsel considered and investigated this evidence. Accordingly, there is no basis to conclude that defense counsel was ineffective with respect to this evidence, or that defendant was deprived of a substantial defense.

> Regarding defendant's claim that counsel was ineffective for failing to present an alibi witness, defendant testified at trial and never claimed that he was elsewhere on the nights of the assaults. Nor is there any record support for defendant's claim that he asked counsel to locate an alibi witness. To the extent that defendant wanted counsel to call the men who defendant allegedly purchased marijuana from, or fought with, on the night he was arrested, defense counsel may have determined that these witnesses were not credible or would not have affected

19

the outcome. Indeed, because there is no claim that these witnesses would have been able to account for defendant's whereabouts on the nights of the charged crimes, defendant cannot show that counsel's failure to call them deprived him of a substantial defense.

*Hilton*, 2005 WL 1489494, at *6.

The Court finds that the Court of Appeals's decision regarding Petitioner's remaining ineffective-assistance-of-counsel claims are not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner has not provided the Court with information about the arrest of another armed masked man, does not identify any alibi witnesses, and does not advise the Court how his counsel could have secured the presence of the individuals from whom he purportedly purchased drugs or fought with. That his clothing might not have been muddy at the arraignment is of little consequence since one of the victim's belongings were found in his possession.

Petitioner has failed to establish that "but for" those alleged errors, the result of his trial would have been different. The Court therefore concludes that he is not entitled to habeas relief regarding his remaining ineffective-assistance-of-counsel claims.

### D. Claim IV–Juror Misconduct and Claim XI–Ineffective Assistance of Appellate Counsel Regarding This Claim

In his fourth habeas claim, Petitioner alleges juror misconduct. There was an altercation between one of the jurors and Petitioner's mother, Katrina Hilton, and a friend, in the court hallways. In Ms. Hilton's affidavit submitted to the Court of Appeals in Petitioner's motion for reconsideration, she states that it was she who initiated the altercation with the juror. Ms. Hilton claims that she was attempting to pull a friend of Petitioner's away from the juror and the juror got angry. In his eleventh habeas claim, Petitioner alleges that appellate counsel was ineffective for

20

failing to raise this claim on appeal. The Court finds Petitioner's juror-misconduct claim procedurally defaulted because the Court of Appeals deemed the issue "abandoned."

Federal-habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine is applicable when a petitioner fails to comply with a state-procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state[-]procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989) (citations omitted). The last explained state-court judgment should be used to make that determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If that judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

In *Harrington*, ___ U.S. at ___, 131 S.Ct. at 784-85, *supra*, the United States Supreme Court stated in pertinent part: "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."

With *Harrington* in mind, this Court finds that it is clear that the Court of Appeals did not reach the merits of this claim, but rather, it relied on state-law-procedural principles in denying relief. The Court of Appeals found that Petitioner "abandoned" this claim, stating:

> After the trial court imposed sentence, defense counsel stated that she had moved for a new trial based on juror misconduct, but had not been able to submit an affidavit in support of the motion because the juror in question failed to appear at her office and apparently was not returning counsel's telephone calls. Counsel indicated

21

that her request for an adjournment had been denied.  The trial court also declined counsel's request that the court voir dire the juror in question, who was subpoenaed, because of the lack of an affidavit.

Although defendant now argues that the trial court erred by not entertaining his motion for a new trial, defendant never did submit a supporting affidavit, either below or on appeal, and he does not discuss the alleged misconduct in his appellate brief.  A party may not merely announce a position and leave it to this Court to discover and rationalize the basis for his claim.  We therefore deem this issue *abandoned* and decline to consider it.

*Hilton*, 2005 WL 1489494, at *4 (citation omitted) (emphasis added).

A review of Michigan cases shows that the principal of abandonment is regularly applied and is a ground independent of the merits.  Therefore, Petitioner's failure to comply with state-procedural rules concerning the preservation and the presentation of his claims in the Court of Appeals is considered a procedural default.  *See People v. Watson*, 245 Mich.App. 572, 587, 629 N.W.2d 411 (2001) (citing *People v. Kelly*, 231 Mich.App. 627, 640-41, 588 N.W.2d 480 (1998); *Prince v. MacDonald*, 237 Mich.App. 186, 197, 602 N.W.2d 834 (1999)); *see also Santiago v. Booker*, No. 07-cv-15445, 2010 WL 2105139, at *17 (E.D. Mich. May 25, 2010) (procedural default where the petitioner abandoned his claim that prosecutor reduced the burden of proof); *Belanger v. Stovall*, No. 07-cv-11336, 2009 WL 2390539, at *21 (E.D. Mich. July 31, 2009) (state courts did not address the petitioner's claims because they were not raised as specific arguments and thus were procedurally defaulted); *Marchbanks v. Jones*, No. 1:06-CV-269, 2009 WL 1874191, *8 (W.D. Mich. June 26, 2009) (same) (citing *Watson*, 245 Mich.App. at 587, 629 N.W.2d at 421-22).

Habeas review of a procedurally defaulted claim is precluded unless Petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that a failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "[T]he existence of cause for a procedural default

22

must turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Petitioner does not assert ineffective assistance of appellate counsel as cause to excuse the procedural default of this claim because he does not recognize the claim as being procedurally defaulted. However, he does raise, as a separate claim, an ineffective-assistance-of-appellate-counsel claim regarding this issue. The Court finds that he has not shown that appellate counsel was ineffective. The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To prevail on a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate that appellate counsel's performance was deficient and that the deficient performance prejudiced the appeal. *Strickland*, 466 U.S. 668, 687 (1984).

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court has explained: "For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard." *Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*,

23

477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52).  "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome."  *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).  Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal.  *See Meade v. Lavigne*, 265 F.Supp.2d 849, 870 (E.D. Mich. 2003).

Petitioner has failed to show that, by omitting this claim in his direct appeal, appellate counsel's performance fell outside the wide range of professionally competent assistance.  Appellate counsel presented legitimate and viable issues on direct appeal.  Petitioner has not shown that appellate counsel's strategy in presenting those claims and not raising this claim was deficient or unreasonable.  A federal court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Additionally, Petitioner has not established that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner has made no such showing.  Thus, his claim is procedurally barred and not subject to federal-habeas review.

24

Even if the Court were to find that this claim was not procedurally defaulted, the Court would nevertheless find that the claim lacks merit. The Sixth Amendment to the United States Constitution guarantees a criminal defendant a trial by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The presence of even a single biased juror deprives a defendant of his right to an impartial jury. *Morgan*, 504 U.S. at 729; *Williams v. Bagley*, 380 F.3d 932, 943-34 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005).

Jurors are presumed to be impartial. *Irvin*, 366 U.S. at 723 (1961). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.  * * * Due process means a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). A juror must be able to "lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723 (citations omitted). A biased juror, in the usual sense, "is one who has a predisposition against or in favor of the defendant. In a more limited sense, a biased juror is one who cannot 'conscientiously apply the law and find the facts.'" *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)). "If an impaneled juror was actually biased, the conviction must be set aside." *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (citations omitted).

Moreover, the question of bias of an individual juror at a state-criminal trial is a question of historical fact. *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *see also Sizemore v. Fletcher*, 921 F.2d 667, 672-73 (6th Cir. 1990) (citing

25

*Smith*, 455 U.S. at 218).  A state-court decision on this issue based on a factual determination will not be overturned unless it was objectively unreasonable in light of the evidence presented in the state court proceeding.  *Dennis*, 354 F.3d at 518.  "The question for this Court is simply whether the state court's decision was 'fairly supported by the record,' not whether it was right or wrong in its determination of impartiality." *Id.* (quoting *Wainwright*, 469 U.S. at 424).

On the last day of trial, it was brought to the trial court's attention, through an alternate juror, that one of the jurors may have been acquainted with the defense and that the juror approached a friend of Petitioner's family in the hall.  Petitioner's mother reportedly pulled the friend away from the juror and told him that the judge said that jurors were not to talk to Petitioner, his family, or his friends. Out of the presence of the jury, the trial court questioned the juror.  It was discovered that the juror worked at the same hospital as Petitioner's mother, but that the juror did not know her personally; rather, the juror said she recognized Petitioner's mother because she worked at the same facility.  After discussing the situation with the juror, the trial court excused the juror.

It is Petitioner's position that, after the hall incident, the juror appeared to be laughing at him and his mother throughout the remainder of the trial.  However, even if the juror improperly made contact with Petitioner's friend, Petitioner has not shown that this negatively effected his case.  No presumption of prejudice arises merely from the fact that improper contact occurred.  *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999).  Moreover, the juror was excused.

Against that backdrop, the Court concludes that Petitioner is not entitled to habeas relief regarding his juror-misconduct claim.

### E.  Claim V–Prosecutorial Misconduct Regarding the Use of Perjured Testimony

In his fifth habeas claim, Petitioner asserts that he was denied a fair trial because the

26

prosecutor used perjured or misleading testimony of police officers to secure his convictions.

The Court finds that this issue also is barred from habeas review under the procedural default doctrine. *Coleman*, 501 U.S. at 750; *See* Section IV, D, *supra*. The Court of Appeals determined that Petitioner waived this issue on appeal and discussed the issue for "plain error affecting substantial rights." *Hilton*, 2005 WL 1489494, at *4.

The Court of Appeals, in rejecting this claim, stated:

> Although defendant points out that the search warrant return form listed only one wallet, whereas a preliminary complaint report and testimony at trial referred to two wallets, this discrepancy was addressed at trial and was attributed to how a separate wallet insert that BJ normally carried inside his wallet was characterized. Whether the alleged discrepancy was adequately explained at trial was a matter for the jury to decide. It does not demonstrate that false evidence was used to secure defendant's convictions.
>
> Contrary to defendant's claim that the police could not have searched his home until after they interrogated him because they did not know his address before then, Sergeant Coleman testified at trial that defendant disclosed his address at the scene of his arrest and that officers then went to defendant's home and were allowed to search it. Thus, defendant has not demonstrated that the evidence that defendant's house was searched before defendant was interrogated was false.
>
> Nor is there any merit to defendant's claim that the police falsely testified that defendant's wife consented to the search of defendant's home. At trial, defendant's wife admitted that she consented to the search. Further, defendant does not challenge the trial court's denial of his suppression motion wherein he argued that his wife had not consented to the search.
>
> Finally, the fact that TT and SK both testified that they recognized defendant's voice as the voice of their assailant after hearing, for the first time, defendant's voice at trial does not establish that they testified falsely merely because they had previously testified that they did not recognize their assailant's voice.

*Hilton*, 2005 WL 1489494, at *5-6 (citations omitted).

"Controlling precedent in our circuit indicates that plain[-]error review does not constitute a waiver of state[-]procedural default rules." *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

27

The state court's plain-error analysis does not save Petitioner from the procedural default of this claim. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). "Plain[-]error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits." *Id.* *See also*, *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (limited review of an issue to prevent manifest injustice does not constitute a waiver of the procedural default). The claim may only be reviewed by this Court if Petitioner demonstrates cause and prejudice. *Gulertkin v. Tinnelman-Cooper*, 340 F.3d 415, 422-23 (6th Cir. 2003). The only candidate for cause would be Petitioner's allegation that trial counsel was ineffective for failing to object to the alleged error.

In his habeas petition, Petitioner does not allege ineffective assistance of trial counsel regarding this claim. He did however raise it in the Court of Appeals. The Court of Appeals also found that Petitioner waived this issue on direct review, stating, "[b]ecause defendant did not raise [this] issue[] in an appropriate motion in the trial court, our review is limited to mistakes apparent from the record." *Hilton*, 2005 WL 1489494, at *6. It then concluded: "[l]astly, having found no merit to defendant's claims that the police falsely testified that two wallets were found, and that defendant's wife consented to a search of defendant's home, we reject defendant's claims that defense counsel was ineffective for failing to argue these points at trial." *Hilton*, 2005 WL 1489494, at *7 (citation omitted).

Accordingly, this aspect of Petitioner's claim is procedurally defaulted and not subject to federal habeas review. *Smith v. Bradshaw*, No. 07-4305, 2010 WL 154792 (6th Cir. Jan.19, 2010) ("This claim is procedurally defaulted: counsel failed to object to the comment at trial, and the state court enforced the procedural bar by reviewing the claim only for plain error."). However, even if

28

the Court found that this claim was not procedurally defaulted, it would nonetheless find that Petitioner's claim lacks merit.

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected. *Napue*, 360 U.S. at 269-270. It is equally well-established, however, that Petitioner bears the burden of proving that the testimony amounted to perjury. As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987) (citations omitted); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation.").

To succeed on this claim, Petitioner would need to show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew or should have known of the falsity; and (3) the evidence was material. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1999) (citation omitted). As the *Verser* Court further explained, to establish a constitutional violation, petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984));

29

*see also Horton v. United States*, 983 F.Supp. 650, 657 (1997) (in order to establish a *Napue* violation, defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory'")) (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)). In other words, Petitioner must show that the testimony was "indisputably false." *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

As the Sixth Circuit has explained, in order for a witness' perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975); *see also King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999). Here, the record does not support Petitioner's contentions that his convictions were secured by false evidence, or that the prosecutor either knowingly presented false evidence or knowingly allowed false testimony to stand uncorrected. Although the search warrant return form listed one wallet, the discrepancy was addressed at trial–BJ carried a wallet and a separate insert. And, Sergeant Coleman testified at trial that Petitioner disclosed his address at the scene. Furthermore, Petitioner's wife also testified at trial that she consented to the search. Thus, Petitioner's claim that the prosecutor used false evidence to secure his convictions is meritless. Petitioner is not entitled to habeas relief regarding this claim.

### F. Claim VI and Claim X–*Brady* Claim

In habeas claim six, Petitioner contends that his clothing should have been available at trial to show that he was not covered in mud at the time of his arrest. Petitioner asserts that, had his clothing been preserved, it could have contradicted the officers' claims that his clothes were dirty and muddy. In habeas claim ten, he alleges that this is a violation of *Brady v. Maryland*, 373 U.S.

30

83 (1963).  Although couched as a *Brady* claim, Petitioner's claim is more correctly stated as a failure-to-preserve-potentially-useful-evidence claim.  The Court therefore will address it as such.

The Due Process Clause requires that the State disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citation omitted). "Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, *see Trombetta*, 467 U.S. at 489, versus cases where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

A defendant's due process rights are violated where material exculpatory evidence is not preserved.  *Trombetta*, 467 U.S. at 489.  For evidence to meet the standard of constitutional materiality, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Id.* at 488-89. The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith.  *See id.* at 488; *Youngblood*, 488 U.S. at 57.

However, "the Due Process Clause requires a different result when [] deal[ing] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58.  A habeas petitioner has the burden of establishing that the police acted in bad faith

31

in failing to preserve potentially exculpatory evidence. *See Malcum v. Burt*, 276 F.Supp.2d 664, 683 (E.D. Mich. 2003).

The last state court to issue a reasoned opinion regarding this claim, the Court of Appeals, held that Petitioner's rights were not violated. The Court of Appeals applied the standard articulated in *Youngblood* and concluded that Petitioner did not demonstrate that the police acted in bad faith or that the evidence was exculpatory. The Court of Appeals reasoned:

> In this case, there is no likelihood that the missing clothes could have exonerated defendant. The presence or absence of dirt and mud on the clothes was relevant only to whether defendant may have been the same person the police observed skulking in the park. That fact was not a material issue in the case, however. Rather, the material evidence against defendant was that he matched the physical characteristics of the perpetrator and, more significantly, that personal items stolen from BJ were found in defendant's bedroom, along
> with a nine-millimeter bullet, and that defendant's fingerprints were found on a box in MM's car.
>
> Accordingly, defendant has failed to show that the police acted in bad faith in failing to preserve his clothes. Indeed, there is no indication that defendant ever asked for the clothes. Therefore, we reject this claim of error.

*Hilton*, 2005 WL 1489494, at *5-6.

That decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Petitioner has not demonstrated that the evidence of his clothing was exculpatory. The record is devoid of evidence that the police or prosecution authorities acted in bad faith–a necessary requirement to establish a constitutional violation where the evidence was only potentially useful to the defense. Given such circumstances, Petitioner has not established a constitutional violation. Habeas relief is not warranted.

### G.  Claim IX–*Batson* Claim

In his ninth habeas claim, Petitioner alleges that his equal protection rights were violated

because the prosecutor excluded jurors for racial reasons.

"It is settled that the Constitution's guarantee of equal protection ensures that a party may not exercise a peremptory challenge to remove an individual on account of that person's race." *McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 521 (6th Cir. 2001) (citations omitted).  In other words, the Equal Protection Clause prohibits prosecutors from "challeng[ing] potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. *Batson*, 476 U.S. at 96-98.  "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Id.*  To establish a prima facie case of purposeful discrimination during the selection of a jury:

> [T]he defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."  Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.  This combination of factors in the empaneling of the petit jury . . . raises the necessary inference of purposeful discrimination.

*Batson*, 476 U.S. at 96 (internal citations omitted).  Second, once the defendant has made a prima facie showing, the burden then shifts to the prosecution to offer a race neutral explanation for challenging the jurors.  *Id.* at 97-98.  Finally, the trial court is charged with determining whether the defendant has established purposeful discrimination.  *Id.* at 98.

Normally, the remedy for a *Batson* violation is to either (1) discharge the venire and select

a new jury from a panel not previously associated with the case, or (2) disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire. *Batson*, 476 U.S. at 99, n.24. However, when the procedural posture of the case is such that neither of these two remedies are available, automatic reversal of the conviction is required. *Id.* (remanding for further proceedings, and holding that "[i]f the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed"); *Avery v. Georgia*, 345 U.S. 559, 561 (1953) (finding that jury selection conducted on the basis of race requires reversal notwithstanding the strength of the evidence against the accused); *see also Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (same).

The last state court to review Petitioner's *Batson* claim, the Court of Appeals stated:

> In this case, after defense counsel raised a *Batson* objection, the prosecutor responded that he had peremptorily dismissed three black females, a black male, and two white females, and that there was no pattern of discrimination. Although the prosecutor offered to explain his reasons for excluding the prospective black jurors, the trial court stated that defendant had not yet met his burden of proof.

> Defense counsel conceded that there were legitimate reasons to excuse the black male, and that the prosecutor had excluded two white females, but maintained that the prosecutor had no legitimate reasons to exclude the three black females. The court denied defendant's challenge, concluding that counsel had failed to establish a prima facie case of purposeful discrimination.

> Contrary to defendant's argument, the trial court did not improperly shift the burden of proof. Rather, "the burden of persuasion never shifts to the party exercising the challenge," it remains on the opponent, i.e., defendant. Although defendant showed that the prosecutor used half of his peremptory challenges to excuse three black females, defendant failed to articulate any facts to establish an inference of purposeful discrimination. We conclude that the trial court did not abuse its discretion in denying defendant's *Batson* challenge.

*Hilton*, 2005 WL 1489494, at *7-8 (citation omitted).

34

The Court of Appeals reasonably determined that Petitioner failed to demonstrate racial discrimination on the part of the prosecutor.  The trial court engaged in detailed findings of fact, finding that defense counsel did not make a prima facie showing of discrimination, but that the prosecutor articulated a race-neutral explanation for striking the jurors in question.  The fact that the prosecution used some of its peremptory challenges to exclude some black veniremen falls short of raising an inference of purposeful discrimination necessary to establish a prima facie case under *Batson*. *United States v. Porter*, 831 F.2d 760, 767-68 (8th Cir. 1987).

Under those circumstances, the Court concludes that the Court of Appeals's decision is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner is therefore not entitled to habeas relief on his *Batson* claim.

### H.  Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant . . . .  If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11, Rules Governing Section 2255 Proceedings.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue.  28 U.S.C. § 2253(c)(3); Fed.R.App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).  To receive a certificate of appealability "a

35

petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

For the reasons stated in its opinion and order, the Court concludes that reasonable jurists would neither find its assessment of Petitioner's claims nor its procedural rulings debatable or wrong. The Court therefore declines to issue Petitioner a certificate of appealability.

## V.  CONCLUSION

Accordingly, **IT IS ORDERED** that the "Petition for Writ of Habeas Corpus" [dkt. # 1] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a certificate of appealability.

**IT IS FURTHER ORDERED** that Petitioner's "Motion in Objection" [dkt. # 34] is **DENIED** as moot.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  March 8, 2011

36

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on March 8, 2011.  Also mailed a copy was sent to Gamal Hilton, No. 345944, St. Louis Correctional Facility, 8585 N. Croswell Road, St. Louis, MI 48880 on March 8, 2011.

S/Marie E. Verlinde
Case Manager
(810) 984-3290

37